**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NARCISSUS J. LILLIAN**, | ) |
|                  Plaintiff, | ) |
| v. | ) Case No. 14 C 2605 |
| **NATIONAL RAILROAD PASSENGER CORPORATION**, a Government Corporation, | ) |
|                  Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

In September 2015 National Railroad Passenger Corporation ("Amtrak") filed a Fed. R. Civ. P. ("Rule") 12(c) motion for judgment on the pleadings on Count III of the Second Amended Complaint ("SAC") brought against it by Narcissus Lillian ("Lillian").[1] By sheer coincidence, during that same month the Court of Appeals for the Fourth Circuit issued its decision in Lee v. Norfolk S. Ry., 802 F.3d 627 (4th Cir. 2015) reversing and remanding a lower court decision that Amtrak had cited in its motion. Amtrak then sought and was granted leave to file an amended motion, which has now been fully briefed by the parties and is accordingly ripe for decision. For the reasons set forth in this opinion, Amtrak's amended motion (Dkt. No. 56) is denied.

**Motions for Judgment on the Pleadings: Standards**

Courts review Rule 12(c) motions under the same standards as motions brought under Rule 12(b)(6) (Adams v. City of Indianapolis, 742 F.3d 720, 727-28 (7th Cir. 2014)). Adams, id.

---

[1] Amtrak's motion also sought judgment on Lillian's Count II, which charged retaliation in violation of 42 U.S.C. § 2000e-3, but that effort was mooted when Count II was dismissed on March 2, 2016 (Dkt. No. 62).

at 728 (citations and internal quotation marks omitted) then went on to spell out those standards in terms that encompassed the "plausibility" requirement introduced by what this Court has termed the Twombly-Iqbal canon:

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Factual allegations are accepted as true at the pleading state, but allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief.

Here, however, the disposition of Amtrak's motion turns not on the plausibility or implausibility of Lillian's allegations but rather on a question of pure statutory interpretation.[2] But before this opinion delves into that interpretation, a brief review of the facts giving rise to this case is in order.

## Facts

On January 26, 2014 Lillian -- a 25-year employee of Amtrak -- was stripping the bed of a rail car when he noticed signs of a bed bug infestation on the sheets (SAC ¶ 9 at 8).[3] Lillian had previously been exposed to bed bugs on Amtrak trains and promptly informed his supervisor

---

[2] For that same reason, this opinion need not wrestle with the post-Adams opinions emanating from our Court of Appeals that have delivered differing messages as to the relevance of the Twombly-Iqbal canon in the judgment-on-the-pleadings context (compare Levin v. Miller, 763 F.3d 667, 671 (7th Cir. 2014) with Vinson v. Vermilion County, Ill., 776 F.3d 924, 928 (7th Cir. 2015)).

[3] Because Lillian (unhelpfully) repeated paragraph numbers throughout his SAC, this opinion cites to the SAC's allegations as "SAC ¶ -- at --," with the "at" number referring to the page or pages of the SAC at which the cited paragraph or paragraphs appear, Memoranda filed by the parties are cited "Mem. --," "Resp. Mem. --" and "Reply Mem. --."

about what he believed to be an unsafe and hazardous working condition (SAC ¶ 10 at 8). According to Amtrak policy, passenger cars that were found to have evidence of insect infestation needed to be pulled from service and inspected (SAC ¶ 11 at 8). Nevertheless, Amtrak[4] refused to inspect the passenger car to determine whether there was an insect infestation (SAC ¶ 12 at 8). Instead Amtrak informed Lillian that the same car had been fumigated two months earlier and ordered Lillian to resume stripping the car (SAC ¶ 13 at 8). That did not however reassure Lillian, who had suffered from rashes and infections when he was previously exposed (SAC ¶¶ 10 and 14 at 8). Because of Lillian's concern for his health and safety, he refused to resume stripping the car, and Amtrak first took him out of service and then terminated him in June 2014 (SAC ¶¶ 15 and 19 at 9). In July 2014 Lillian filed an administrative complaint with the Department of Labor, Occupational Safety and Health Administration for violations of the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA")[5], and 210 days later he gave notice of his intention to file this action (SAC ¶ 7 at 7-8). In March 2015 the Department of Labor informed him of his right to sue (id.).

Lillian had been able to work at Amtrak for 25 years in spite of his being diabetic, a condition that required him to monitor and control his glucose levels carefully at all times (SAC ¶ 6 at 2). Amtrak was aware of that disability and occasionally accommodated Lillian by allowing him to take lunch breaks in order to maintain his glucose levels (SAC ¶ 8 at 2). But in a series of incidents between 2007 and 2013, certain supervisors threatened disciplinary action

---

[4] This opinion's references to conduct by "Amtrak" are compelled by the imprecision on the part of Lillian's counsel in identifying the relevant actors throughout most of the SAC.

[5] All citations to FRSA will take the form "Section --" without any need for repeated references to Title 49.

against Lillian for his taking those lunch breaks (SAC ¶¶ 9-12 at 3). That led Lillian to file a December 2012 complaint with the Equal Employment Opportunity Commission ("EEOC") charging Amtrak with violations of the Americans with Disabilities Act ("ADA," 23 U.S.C. § 12117 et seq.[6]) (SAC ¶ 2 at 1). After the bedbug incident described in the first paragraph of this Facts section had led to Lillian's termination, he filed a second charge alleging disability discrimination and retaliation (id.). Those charges resulted in right-to-sue letters being issued by the EEOC in early 2014 (id.), and this action followed.

## Viability or Nonviability of Count III

Lillian has advanced two theories of recovery against Amtrak stemming from his termination in June 2014. Count I[7] charges that Amtrak violated the ADA by retaliating against him for seeking reasonable accommodation of his disability (SAC ¶¶ 16-17 at 4-5) while his Count III alleges that Amtrak violated FRSA by retaliating against him for reporting potential safety violations (SAC ¶¶ 18-20 at 9). Both parties agree that Count III's viability or nonviability turns on the scope of FRSA's election-of-remedies provision, Section 20109(f):

> Election of remedies.--An employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier.

---

[6] All citations to the ADA will take the form "Section --" without any need for repeated references to Title 23.

[7] This lawsuit is atypical in that its two surviving counts actually adhere to the limited role prescribed by the second sentence of Rule 10(b), which calls for the use of counts to separate different claims for relief, not different theories of recovery on the same claim (for an excellent discussion on that subject, see NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 292 (7th Cir. 1992)). As will become relevant later in this opinion, Lillian's ADA count arises from operative facts distinct from those giving rise to his count under FRSA.

Amtrak posits that because Lillian's theories under both FRSA and the ADA are predicated on his termination,[8] his FRSA theory must be barred because it arose from "the same allegedly unlawful act of the railroad carrier" (id.) as his ADA theory. Lillian responds that while the <u>act</u> at issue may be the same under both theories, those theories stem from different <u>unlawful</u> acts and can therefore be pursued concurrently.

As previewed in the introduction to this opinion, during the course of the parties' briefing on Amtrak's motion the Fourth Circuit addressed the very issue presented here in its <u>Lee</u> decision. There a railway employee alleged that his employer, Norfolk Southern Railway Company ("Norfolk"), had suspended him on the basis of his race in violation of 42 U.S.C. § 1981 ("Section 1981"). After that theory was rejected via summary judgment, the employee brought a second action under FRSA charging that he had been suspended in retaliation for his having reported a safety violation. Norfolk, successfully invoking Section 20109(f), obtained summary judgment against its employee. <u>Lee</u> reversed and remanded, and this Court finds both its reasoning and conclusion to be entirely persuasive (though of course not binding).

<u>Lee</u>, 802 F.3d at 631 (with citations omitted) looked to the plain language of Section 20109(f) in addressing the contention that the railway employee's theories under Section 1981 and under FRSA were predicated on the same "act":

> But the Election of Remedies provision applies to "the same allegedly unlawful act" -- not merely "the same act." And Lee's suspension standing alone is not "unlawful." Rather, to become unlawful, the suspension must have (of course) violated a law.

---

[8] To be more precise, Lillian's ADA theory is only partially predicated on his termination -- he has also alleged ADA violations during the course of his employment (SAC ¶¶ 9-13 at 3-4). Those allegations are not at issue here.

> In the first lawsuit then, the "allegedly unlawful act" was the suspension on the basis of race in violation of Section 1981; in the second lawsuit, the "allegedly unlawful act" was the suspension on the basis of retaliation for Lee's whistleblowing regarding rail safety violations. These are distinct causes of action with different elements and burdens of proof.
>
> * * *
>
> In short, the "act" may be the "same" in both lawsuits, but the "act" is "allegedly unlawful" for fundamentally different reasons. Under the ordinary meaning of the statute then, a suspension on the basis of race and a suspension on the basis of whistleblowing are not the "same allegedly unlawful act."

That logic carries equal force here. While both of Lillian's counts stem from his termination, that termination is allegedly unlawful under the ADA for a wholly different reason than it is allegedly unlawful under FRSA. As such, Lillian has not sought protection under two statutes for the "same allegedly unlawful act."[9]

---

[9] <u>Lee</u>'s sensible approach to reading Section 20109(f) is buttressed by the principle of construction set out in The Chicago Manual of Style § 6.39 (15th ed. 2003) (emphasis in original):

> When a noun is preceded by two or more adjectives that could, without affecting the meaning, be joined by <u>and</u>, the adjectives are normally separated by commas. But if the noun and the adjective immediately preceding it are conceived as a unit . . . no comma should be used.

And <u>Lee</u>, 802 F.3d at 632 adduced further solid support for its approach from William Sabin, The Gregg Reference Manual §§ 123(c) and 169 (11th ed. 2008) and <u>Black's</u> <u>Law</u> <u>Dictionary</u> 1771 (10th ed. 2014). All those authorities applied squarely to FRSA, as <u>Lee</u>, 802 F.3d at 632 explained:

> Congress did not use a comma between "same" and "allegedly unlawful," thus indicating that those words do not independently modify "act."

- 6 -

That conclusion is supported by Congress's 2007 addition to FRSA's Section 20109 of two provisions expressly disclaiming any intention to diminish employees' rights under state or federal law:

> (g) No preemption. -- Nothing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law.
>
> (h) Rights retained by employee. -- Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law or under any collective bargaining agreement. The rights and remedies in this section may not be waived by any agreement, policy, form, or condition of employment.

In this instance, forcing Lillian to abandon his rights under FRSA in order to vindicate his rights under the ADA (or vice-versa) would collide head-on with those clear admonitions that FRSA should not be deemed to diminish an employee's legal rights -- and particularly his rights under antidiscrimination statutes (see Section 20109(g)). Amtrak's effort to do just that must fail.

Driving the final nail into the coffin interring Amtrak's effort is our own Court of Appeals' sound rejection of an overbroad reading of Section 20109(f) in a similar context -- and, coincidentally, in an action against the selfsame railroad that later lost the Lee case in the Fourth Circuit. Reed v. Norfolk S. Ry., 740 F.3d 420 (7th Cir. 2014) turned on whether an employee's pursuit of arbitration under the Railway Labor Act (45 U.S.C. § 153) constituted an election to seek protection under another "provision of law," so that Section 20109(f) would doom the employee's FRSA allegations. In determining that it did not, Reed, id. at 426 quoted Section 20109(h) as showing that Congress "affirmatively disclaim[ed] any intention to diminish railway employees' rights" (id. at 425-26). Accordingly Reed, id. at 426 concluded:

> The election-of-remedies provision only bars railroad employees from seeking duplicative relief under overlapping antiretaliation or whistleblower statutes[.]

That plainly is not what Lillian is seeking here. While Amtrak's Reply Mem. 3 contends that the ADA and FRSA are "clearly similar and overlapping" because both are antiretaliation statutes, that interpretation distorts Reed by effectively reading "overlapping" out of the analysis.[10] As the ADA and FRSA protect wholly distinct interests and do not offer "comparable substantive protection[s]" (id. at 425 -- see n.10), they cannot be regarded as overlapping, and Lillian's lawsuit may proceed on both tracks.

**Conclusion**

Except to the extent granted by this Court's March 2, 2016 minute entry (Dkt. No. 62), Amtrak's amended motion (Dkt. No. 56) is denied. To discuss further proceedings in this action, counsel for the parties are ordered to appear for a status hearing at 9 a.m. April 11, 2016 instead of the previously-set April 28 status hearing date.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 30, 2016

_____

[10] Notably, Reed, 740 F.3d at 425 was not silent on what would constitute an overlapping statute for purposes of Section 20109(f):

> To seek protection under another provision of law must mean something similar: to bring a claim founded on a comparable substantive protection. For example, we agree that if Reed brought a claim under the Occupational Safety and Health Act, which extends whistleblower protection to employees that file a workplace safety complaint or take other protected action, the election-of-remedies provision would bar a successive FRSA claim.

Unlike the Occupational Safety and Health Act, the protections offered by the ADA are not "comparable" to those offered by FRSA.