IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **NARCISSUS J. LILLIAN**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14 C 2605 |
| | ) | |
| **NATIONAL RAILROAD PASSENGER** | ) | |
| **CORPORATION**, a Government Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Narcissus Lillian ("Lillian") has brought this action against his former employer, the National Railroad Passenger Corporation ("Amtrak"), charging it with violations of federal law for actions that culminated in its terminating Lillian's employment on June 6, 2014.[1] Lillian claims that Amtrak is liable (1) under the Safety Act for retaliation after he reported a safety violation to his supervisors (Count III) and (2) under the Americans with Disabilities Act ("ADA") for both discrimination (Count I) and retaliation against him after he complained of that discrimination to the Equal Employment Opportunity Commission ("EEOC") (Count II). Each side has now brought a Fed. R. Civ. P. ("Rule") 56 motion for summary judgment as to liability, with Amtrak seeking judgment on all counts and Lillian solely on Count III.[2]

---

[1] Amtrak (defined as a carrier that engaged in interstate commerce under the Federal Rail Safety Act ("Safety Act")) first employed Lillian in 1989 as a train attendant and member of Amtrak's ready crew (A. St. ¶¶ 2-6).

[2] Lillian's and Amtrak's memoranda in support of their motions for summary judgment are respectively cited "L. Mem. --" and "A. Mem --," while their LR 56.1(a)(3) statements of fact in support of the motions are respectively cited "L. St. ¶ --" and "A. St. ¶ --". Responses to those
(continued)

**Factual Background**

On January 26, 2014 Amtrak assigned Lillian to clean railcar 39028 (L. St. ¶ 21). According to Lillian, he asked one of his supervisors (Lisa Simane ("Simane")) if the railcar was safe in light of its having been flagged for bedbug infestation (id. ¶ 22). After speaking with the head of the Mechanical Department and supervisor Monica Morris ("Morris"), Simane learned that the railcar had been fumigated at the previous station (AR. L St. ¶¶ 22-24). Based on that information, Simane then told that to Lillian, who entered the car and began working despite some hesitation (id. ¶ 24).

Lillian asserts that after he had completed cleaning the first room in the car and moved on to the second room, he saw there what he believed to be bedbugs in a semi-circle moving on a mattress and made a report to his supervisor that he saw "moving black specks" (L. St. ¶ 25). Simane denies that Lillian said that the black specks were moving (AR. L. St. ¶¶ 25-27), although neither Simane nor Morris entered the car following Lillian's report to confirm or reject what led to his report (id. ¶¶ 33, 35). Lillian says he told Simane that he felt unsafe and therefore could not reenter the car (L. St. ¶ 27). But Simane claims Lillian gave no explanation, although she admitted that he said "I can't do it. I just can't do it." (AR. L. St. ¶ 27).

After Lillian refused to reenter the train, Amtrak charged him with refusing a directive from his supervisors on January 26, 2014 (A. Add. St. ¶ 18). Amtrak (specifically Deputy General Manager of the Central Region Morrell Savoy ("Savoy")) then found Lillian guilty of that charge -- refusing a directive from a supervisor -- following his May 28 formal disciplinary

---

(footnote continued)
statements use the abbreviations "LR. A. St. ¶ --" and "AR. L. St. ¶ --". Parties' additional statement of facts in opposition to Amtrak's motion are cited "L. Add. St. ¶ --" and "A. Add. St. ¶ --". Responses to LR 56.1 statements are abbreviated "AR. L. Add. St. ¶ --" and "LR. A. Add. St. ¶ --".

hearing (id. ¶ 19). Amtrak's hearing officer also cited two prior terminations in Lillian's file as factors in his ultimate decision to terminate Lillian (id. ¶ 20).

One month before the incident described above, Lillian reported to his supervisors Morris and Simane that he was bitten while cleaning a railcar (L St. ¶¶ 16-17). Although Amtrak admits that Lillian reported that he was bitten by bedbugs, it nonetheless denies the truth of his report (AR. L St. ¶ 17), citing a medical report in which a doctor noted "pruritic bumps scattered throughout the forearms, eventually involving the chest, abdomen, thighs, knees, lower legs, pulse, and hands" (id. Ex. A).[3] In that respect Lillian claims that Morris told him he could be reprimanded for failing to report the incident sooner (L St. ¶ 18). As a train attendant Lillian worked under guidelines requiring him to report any potential safety matter (including bedbugs) to a supervisor and to inspect and treat railcars containing signs of bedbug infestation appropriately (AR. L St. ¶ 7). Lillian claims (though Amtrak disputes) that once an employee reports signs of bedbugs or once a car has been flagged, management must notify someone from Amtrak's mechanical department who must then come to do the inspection (L St. ¶ 9). Railcars are then typically locked off, and the employees are told not to enter the car until the inspection is completed (id. ¶ 10, AR. L St. ¶ 8). Lillian points to his understanding of those guidelines as the reason for his non-compliance in the events leading to his Safety Act claim.

As for Lillian's ADA claim, its history goes back even farther than his Safety Act claim. Lillian's initial job application stated that he has diabetes, a condition that limits what and when he can eat (L. Add. St. ¶ 4). In 1994 he requested an accommodation to have adequate time for

---

[3] That medical report does not mention bedbugs, but it also does not name a different cause of the rash, hypothesizing that it could have arisen in a trip Lillian made to India earlier that month. But as this opinion explains later, such speculation does not undercut the relevant standard that looks to Lillian's subjective belief as to his earlier experience.

meal breaks, which included eating meals no more than 4 or 5 hours apart (id.). Lillian informed his supervisor at the time, a Mr. Erford ("Erford"), about the importance of his meal schedule (id. ¶ 5). Erford told Lillian that an accommodation "may be grounds for disqualification" in his current position (id.). Following that conversation Lillian submitted a written complaint (id.).

In 2001 Amtrak set up a central body (the "ADA Panel") that evaluates requests for accommodations (A. St. ¶ 15). In September 2003 Lillian submitted a statement of disability to that ADA Panel together with a doctor's note stating that he must have control over "the times he eats" (L. Add. St. ¶ 6). On November 24, 2003 the ADA Panel gave him an accommodation that allowed for food and beverage accommodation sufficient to meet his dietary needs (A. St. ¶ 19).

Still unhappy with his treatment, Lillian sent the ADA Panel an accommodation request on October 12, 2007 together with a letter from his physician calling for a formal accommodation that would allow him to take breaks whenever he needed them (L. Add. St. ¶ 8). Lillian's accommodation letter also sought an allowance for meals while working en route (A. St. ¶ 20). On December 18, 2007 Amtrak's ADA Panel granted Lillian an accommodation that allowed two entrees per meal from Amtrak's meal service, but the accommodation did not allow him to take his meals at any time he deemed necessary (id. ¶ 21).

By 2011 Lillian had two new supervisors, Jonathan Lombardi ("Lombardi") and Natalie Berry ("Berry"). Lillian claims that he informed them he had diabetes before May 2012, so that they understood his need for lunch breaks (L. Add. St. ¶ 16). He also claims that Lombardi told him that if he needed a 15-minute snack break due to his medical condition, it would "not be a problem" (id. ¶ 15). Amtrak denies that any conversations between Lillian and his supervisors were for the purpose of seeking an accommodation (AR. L. Add. St. ¶ 16).

Lillian asserts that on both May 30 and June 30, 2012 he went 5 hours between meals and took a short break to eat (L. Add. St. ¶ 17).  Amtrak claims that on those two dates Lillian took lunch before completing his duties, and when he was asked to return to his duties he refused (A. St. ¶ 30).  Following the June 30 incident Morris signed a notice of formal investigation against Lillian (L. Add. St. ¶ 22).  On July 19, 2012 the formal investigation charged Lillian with violating three provisions of Amtrak's standards of excellence:

> (1) the Attending to Duties standard, (2) the Professional and Personal Conduct (Teamwork) standard, and (3) the Professional and Personal Conduct (Conduct) standard. Specifically, the charge accused Lillian of (1) not finishing his work assignment when he left Train 21 without completing the dorm car set up on May 30, 2012; (2) not conducting himself professionally when managers made him aware that he needed to return to the train to complete the dorm car set-up, and (3) taking lunch on June 30, 2012 without first completing his duties on Train 21.

(A. St. ¶ 46).  Following a formal hearing in November 2012, Amtrak's hearing board issued Lillian a deferred suspension (id. ¶ 54).

Lillian requested another accommodation around that same time (L. Add. St. ¶ 25), asking "to be allowed to take time to maintain [and] control my diebetic [sic] needs as prescribed by my Doctor" (A. St. ¶ 25).  In support of the request Lillian submitted a letter from his doctor stating that his diabetic condition "require[s] him to eat on a regular schedule" and that it "is important that he have a meal between 11-1pm daily" (id.).  On January 24, 2013 Amtrak granted an accommodation of two 5 to 10 minute breaks during each shift as needed (L. Add. St. ¶ 25).  Lillian asserts that throughout that time his managers continued to threaten that he would lose his job when he mentioned his need to eat for medical reasons (id. ¶ 27).  In March 2013 Lillian requested that Amtrak amend his accommodation to receive a break of up to 30 minutes and up to two 5 to 10 minute breaks (id. ¶ 26).  That request was approved on April 23, 2013 (id.).

Amidst all of the issues as to meeting his diabetic needs, Lillian filed charges with EEOC asserting disability-based discrimination in December 2012 (A. St. ¶ 76). He also continued to make internal complaints of disability discrimination to Amtrak regarding the refusal of his supervisors and managers to grant his request for the accommodation (id. ¶ 78). On January 14, 2014 EEOC issued Lillian a right to sue letter (L. Mem. 13). Lillian had complained of an October 2013 incident in the filing in which he requested a lunch break from his supervisor, who then responded, "How are we supposed to get work done if you eat lunch?" (L. Add. St. ¶ 28). He also cited an occasion when his supervisors approached him while he was eating lunch and accused him of misappropriating the napkin he was using (id. ¶ 30).

On April 11, 2014 Lillian brought a complaint against Amtrak alleging discrimination and retaliation under the ADA. On September 9, 2015 Amtrak filed a motion for judgment on the pleadings that this Court denied. As stated at the outset, Lillian later moved for summary judgment on Count III and Amtrak advanced a like motion on Counts I and II. In Amtrak's response to Lillian's motion it also filed a new motion for summary judgment on Count III.

## Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir.2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and

"must come forward with specific facts demonstrating that there is a genuine issue for trial" (<u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th Cir.2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this opinion accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: It must credit the nonmovant's version of any disputed facts as to each motion, and that can on occasion lead to the denial of both motions. Fortunately that consequence has not eventuated here in all respects.

## **Lillian's Safety Act Retaliation Claim**

Lillian brings a retaliation claim under the Safety Act, which forbids a railroad from discriminating against an employee for reporting, in good faith, a hazardous safety or security condition (49 U.S.C. § 20109 (b)(1)(A)).[4] To establish a retaliation claim under the Safety Act Lillian must show four things by a preponderance of the evidence -- <u>Harp v. Charter Commc'ns Inc.</u>, 558 F.3d 722, 723 (7th Cir. 2009) and cases cited there confirm that principle as to such whistleblower claims, framing the required showing in these terms:

> (1) he engaged in protected activity; (2) his employer knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor to the unfavorable action.

---

[4] All further references to Title 49's provisions will simply take the form "Section --," omitting the prefatory "49 U.S.C. §".

If Lillian establishes his prima facie case in those terms, Amtrak can avoid liability if it proves by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of his protected behavior (id.)

Here Lillian and Amtrak have butted heads on Lillian's Safety Act retaliation claim. Lillian asserts that the court should grant summary judgment because all four elements are clearly met, while Amtrak has countered by arguing that Lillian has no way of proving either the first or the fourth element (Amtrak understandably does not dispute the second or third factor). For the following reasons, summary judgment is granted to Lillian and denied to Amtrak as to both disputed elements of the Safety Act claim, and hence as to the claim itself.

**1.     Protected Activity (Element 1)**

As stated earlier, the Safety Act protects an employee from adverse action when reporting, in good faith, a hazardous safety or security condition. Our Court of Appeals has held that "good faith," as that concept was at issue in a different whistleblower statute, contains both a subjective and an objective component (Lang v. Nw. Univ., 472 F.3d 493, 495 (7th Cir. 2006)).

Recall that the linchpin of the Supreme Court's 1986 trilogy on summary judgments -- Anderson, 477 U.S. at 248 -- taught that the key to granting such relief is the finding that a reasonable jury could not return a verdict for the nonmovant. That standard is met here.

First as to the subjective component, Amtrak's position -- because by definition it cannot know what Lillian believed -- seeks to rely on an inference from his not having identified what he saw as "bedbugs" when making his report to Simane to draw support for a conclusion that he did not actually see bedbugs. But that attempted reliance does not address what was going on in Lillian's mind -- the subjective component of the good faith determination.

In that respect the following undisputed objective facts provide conclusive support for Lillian's version: Remember that he agreed to clean the car after he had been told it had recently been fumigated, and he then cleaned the first room without incident, but when he then went into a second room he saw something that made him run out spontaneously screaming, "I can't do it. I just can't do it."[5] Then he later reported what he believed to be a "hazardous safety condition."

For its part Amtrak never faces up to the significance of that evidence -- it acknowledges Lillian's excited utterance, but it tellingly drops the matter there. There is simply no reasonable explanation for that series of events other than Lillian believing he saw bedbugs -- and Amtrak has not even attempted to provide one.

As for the second component of the "good faith" analysis, Lillian has also offered undisputed evidence demonstrating that the belief that he saw bedbugs was objectively reasonable. Once again, Amtrak had confirmed that the railcar had recently been flagged for bedbug infestation, and that information meshed with Lillian's just-discussed belief and with his history of having complained of bedbugs in cars and of having suffered adverse consequences as a result of one contact with them. In addition, it was common knowledge among Amtrak employees that bedbugs are found in railcars. In sum, both the subjective and the objective components of the good-faith requirement of the Safety Act have been established by Lillian -- and on the other side of the coin, Amtrak has advanced nothing that raises a genuine issue of material fact as to either component. Hence the first element of Lillian's four-factor Safety Act showing has also been established.

---

[5] It is hard to imagine a better example of the Fed. R. Evid. 803(2) "excited utterance" exception to the rule against hearsay -- or of the reason that such utterances are made such an exception: the sense of their innate credibility.

### 2. Contributing Factor (Element 4)

As for the final factor in his Safety Act claim, Lillian must show that his report of bedbugs and its consequences were a contributing factor to his removal from service on January 26, 2014 and ultimately to Amtrak's decision to terminate his employment on June 8, 2014 (Sections 20109(d)(2)(A)(i); 42121(b)(2)(B)(i)). In that respect Amtrak seeks to place emphasis on our Court of Appeals decision in Koziara v. BNSF Ry. Co., 840 F.3d 873 (7th Cir. 2016), which appropriately spoke in terms of "proximate cause" as creating legal liability, pointing to the different definitions of that term (id. at 877). But Koziara, id. at 877-78 went on to refer to the Supreme Court's decision in CXS Transp., Inc. v. McBride, 564 U.S. 685 (2011), which upheld our Court of Appeals' rejection of a definition under the FELA that required a showing that the defendant's conduct "be 'the sole, efficient [or immediate] producing cause' of the injury in order to be actionable" -- and because the conduct of the employee plaintiff at issue in Koziara was so obviously not a proximate cause of the employer railroad's termination of his employment, our Court of Appeals had no occasion there to deal in analytical terms with the precise meaning or scope of the term "contributing factor" in the Safety Act. This Court was perforce required to look elsewhere for persuasive authority on those subjects.

Virtually all of the caselaw in that area comprises opinions at the District Court level -- cases that this Court almost never cites or quotes because our Court of Appeals regularly (and properly) reminds us that District Court opinions are nonprecedential (indeed, this Court does not attempt to bootstrap itself by calling on or referring to its own prior opinions for exactly that reason). But in this instance further research has led to just one other Court of Appeals opinion, that of the Third Circuit in Araujo v. New Jersey Transit Rail Operations, Inc., 708 F.3d 152 (3d

Cir. 2013), which is so comprehensive in its treatment and studied in its analysis as to be worthy of outright adoption.

Normally this Court, on locating such a powerful and thoughtful opinion having precedential value, would follow the usual course of stating its own views in sync with that opinion and buttressing those views by quoting (as well as citing) some selective excerpts from the opinion. But in the present situation that would seem to be presumptuous, an attempt "to gild refined gold, to paint the lily."[6] Instead this Court follows what it believes to be a preferable course: It adopts the Araujo analysis in toto and attaches two of its pages (708 F.3d at 158-59) as Ex. 1 to this opinion.

From that perspective it is highly relevant that Simane and Morris not only failed to take any steps to verify or negate Lillian's expressed safety concerns concerning bedbugs -- they simply removed him from service without any additional time to address those concerns. Nor did they pay heed to the facts that he had completed his other assigned duties that day and that he had even offered to complete other tasks in lieu of stripping car 30289. And most significantly on the contributing factor issue, Amtrak expressly cited Lillian's refusal to follow his supervisors' directives on January 26 as the basis for his disciplinary hearing and eventual termination.

In short, Amtrak has not either clearly or convincingly tendered any "clear and convincing" evidence that Lillian's conduct in the bedbug-based incident was not a contributing factor in its decision to fire him. Indeed, the timing of his termination is additional convincing evidence in the other direction, as well as is the fact that Amtrak did not cite any other recent

---

[6] William Shakespeare, King John act IV, sc. 2. As always, the quoted snippet does not do the great playwright adequate justice -- it is followed by a series of like figures of speech that he ends by labeling the entire assemblage "wasteful and ridiculous excess."

issues of insubordination. This Court must and does therefore grant Lillian's motion for summary judgment on element four and accordingly on Count III as a whole (and of course it must and does correspondingly reject Amtrak's cross-motion on the same Count).

## **ADA Failure To Accommodate Claim**

Amtrak has also moved for summary judgment on Lillian's ADA claim. To establish a claim for failure to accommodate, Lillian must show that (1) he is a qualified individual with a disability, (2) Amtrak was aware of his disability and (3) Amtrak failed to accommodate the disability reasonably (<u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 797 (7th Cir. 2005)). There is no dispute as to Lillian having a disability, or as to Amtrak being aware of that disability, or as to Lillian having received accommodations for that disability. Whether Lillian's request for a "lunch break when necessary" is a reasonable accommodation is the only issue disputed.

With all reasonable inferences being drawn in favor of Lillian, a factfinder could reasonably conclude that Amtrak discriminated against Lillian when it failed to grant him that accommodation. On that score Amtrak knew before 2013 that Lillian's disability required an accommodation that allowed him to eat lunch when necessary. And under the ADA an employer must make "reasonable accommodations" to a disabled employee's limitations unless the employer can demonstrate that to do so would impose an "undue hardship."

To be sure, Amtrak did grant Lillian several accommodations, but before 2013 none of them allowed him to take lunch breaks when necessary. In 2003 Lillian submitted his first request for an accommodation (accompanied by a doctor's letter) that would allow him to take lunch breaks when he deemed necessary. Although Lillian received an accommodation later that year, it did not allow him to take lunch breaks on that basis. So Lillian followed up with Amtrak

in June 2007 by submitting a letter complaining that the accommodation he received did not fulfill his needs. In October 2007 Lillian sent another formal request to Amtrak's ADA Panel, coupled with a letter from his physician, asking for a formal accommodation that would allow him to take breaks whenever he needed, as well as an allowance for meals when en route. In response Amtrak granted only Lillian's request for two entrees per meal from Amtrak's meal service.

It was not until Lillian's third request to Amtrak's ADA Panel that he was granted an accommodation that allowed him to take two 5 to 10 minute breaks as needed during each shift. Eventually Amtrak amended that accommodation to allow for a 30 minute break in addition to the two 5 to 10 minute breaks. Amtrak argues that Lillian failed before 2013 to request an explicit accommodation for a lunch that could be taken when needed, so that any delay in receiving such an accommodation was due to his own failure to seek that accommodation earlier. Yet a factfinder could surely conclude reasonably that Lillian's three submissions to the Amtrak's ADA Panel before 2013 were requests specifically aimed at an accommodation for at-will lunch breaks. In each request Lillian submitted a doctor's note that conveyed the message that his disability required that he take lunch when necessary.

In summary, once again with all reasonable inferences drawn in favor of Lillian, a factfinder could reasonably conclude that Amtrak discriminated against him by failing before 2013 to grant him an accommodation that allowed him to take lunch breaks at will. There are therefore genuine issues of material fact under the ADA, and Amtrak's motion for summary judgment on Count I must be and is denied

## ADA Retaliation Claim

Lastly, Amtrak has also moved for summary judgment on Complaint Count II, Lillian's ADA claim for retaliation. On that score Lillian needs to make a plausible showing as to the existence of a causal link between his protected expression of his need to be accommodated and Amtrak's decision to terminate his employment, and analysis readily provides the answer that no factfinder could reasonably conclude that Lillian's termination was retaliatory.

In that respect Lillian argues that Amtrak retaliated against him for filing charges with EEOC, pointing to Amtrak's having brought insubordination charges against him on January 27, two weeks after EEOC issued him a right to sue letter. He cites instances in which his supervisors chastised him for taking his lunch breaks and disrupted him during those breaks. He also charges that at the time of the May 2014 hearing his supervisors were biased and knew of the EEOC complaint, though he admits that the decision maker, hearing officer Savoy, never had knowledge of the EEOC charges or lawsuit.

Accepting Lillian's well pleaded facts as true, this Court must find for Amtrak on the ADA retaliation claim. Retaliation claims under the ADA can be proved either directly or indirectly (Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011). Lillian has failed to prove retaliation directly because he has not adequately shown a causal connection between his protected EEOC complaint and the termination of his employment. For there to be a causal connection, at a minimum the "neutral Hearing Officer" (Savoy) would have had to know of Lillian's EEOC claim. And other than temporal proximity, Lillian offers nothing to suggest that Savoy was aware of his protected activity.

Moreover, Lillian's EEOC claim was not cited as a reason for the investigation or for his ultimate termination. Lillian similarly cannot show retaliation using the indirect, burden-shifting

## ADA Retaliation Claim

Lastly, Amtrak has also moved for summary judgment on Complaint Count II, Lillian's ADA claim for retaliation. On that score Lillian needs to make a plausible showing as to the existence of a causal link between his protected expression of his need to be accommodated and Amtrak's decision to terminate his employment, and analysis readily provides the answer that no factfinder could reasonably conclude that Lillian's termination was retaliatory.

In that respect Lillian argues that Amtrak retaliated against him for filing charges with EEOC, pointing to Amtrak's having brought insubordination charges against him on January 27, two weeks after EEOC issued him a right to sue letter. He cites instances in which his supervisors chastised him for taking his lunch breaks and disrupted him during those breaks. He also charges that at the time of the May 2014 hearing his supervisors were biased and knew of the EEOC complaint, though he admits that the decision maker, hearing officer Savoy, never had knowledge of the EEOC charges or lawsuit.

Accepting Lillian's well pleaded facts as true, this Court must find for Amtrak on the ADA retaliation claim. Retaliation claims under the ADA can be proved either directly or indirectly (Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011). Lillian has failed to prove retaliation directly because he has not adequately shown a causal connection between his protected EEOC complaint and the termination of his employment. For there to be a causal connection, at a minimum the "neutral Hearing Officer" (Savoy) would have had to know of Lillian's EEOC claim. And other than temporal proximity, Lillian offers nothing to suggest that Savoy was aware of his protected activity.

Moreover, Lillian's EEOC claim was not cited as a reason for the investigation or for his ultimate termination. Lillian similarly cannot show retaliation using the indirect, burden-shifting

method, as it requires that he shows he was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer (Dickerson, 657 F.3d at 601-02).  He has not attempted to do so in his filings.  Accordingly this Court must and does grant Amtrak's motion for summary judgment on Count II.

### Conclusion

For the reasons stated in this opinion, this Court grants (1) Amtrak's motion for summary judgment as to Count II (part of Dkt. No. 81) and (2) Lillian's motion for summary judgment as to Count III (Dkt. No. 75).  This Court of course denies Amtrak's cross-motion for summary judgment on Count III (Dkt. No. 101), and it also denies Amtrak's motion for summary judgment on Count I (part of Dkt. No. 81).  Finally, a status hearing is set at 8:45 a.m. on May 11, 2017 to discuss the next steps in this litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date:  May 3, 2017

is present in a statute, Congress specifically intended to alter any presumption that *McDonnell Douglas* is applicable. The FRSA is clear that AIR–21 burden-shifting applies. However, in this case, the District Court noted that it was unable to locate any binding authority regarding burden-shifting, and discussed both *McDonnell Douglas* and the regulations promulgated by the Department of Labor, 29 C.F.R. § 1982.104(e)(4), which implement the AIR–21 framework. *Araujo,* 2012 WL 1044619, at *5.

Ultimately, the District Court concluded that it did not need to determine whether *McDonnell Douglas* applied, or for that matter, whether the AIR–21 framework is distinct from the *McDonnell Douglas* framework, as according to the District Court, Araujo could not satisfy his burden under either standard. We disagree with this approach. The District Court apparently did not recognize that, in fact, the FRSA explicitly incorporates the AIR–21 burden-shifting by reference. *See id.* ("The parties have not presented any binding authority to the Court concerning how to evaluate the viability of a FRSA whistleblower claim, nor has the Court's own research uncovered any reported cases dealing with FRSA retaliation claims."). Unquestionably, AIR–21 burden-shifting applies to cases brought under the FRSA.

[3, 4] It is necessary for us to interpret the FRSA burden-shifting scheme. Statutory analysis begins with the plain language of the statute, "the language employed by Congress." *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)) (internal quotations omitted). This Court must give effect to the intent of Congress by giving these words their "ordinary meaning." *Id.* (internal quotation omitted). Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework. The plaintiff-employee need only show that his protected activity was a "contributing factor" in the retaliatory discharge or discrimination, not the sole or even predominant cause. *See* 49 U.S.C. § 42121(b)(2)(B)(ii). In other words, "a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Ameristar Airways, Inc. v. Admin. Rev. Bd.,* 650 F.3d 562, 567 (5th Cir.2011) (quoting *Allen,* 514 F.3d at 476 n. 3 (internal quotation omitted)).

[5] The term "contributing factor" is a term of art that has been elaborated upon in the context of other whistleblower statutes. The Federal Circuit noted the following in a Whistleblower Protection Act case:

> The words "a contributing factor" ... mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.* This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant", "motivating", "substantial", or "predominant" factor in a personnel action in order to overturn that action.

*Marano v. Dep't of Justice,* 2 F.3d 1137, 1140 (Fed.Cir.1993) (quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20)) (emphasis added by Federal Circuit). Furthermore, an employee *"need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action." *Marano,* 2 F.3d at 1141 (emphasis in original); *see also Copping-*

*er-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir.2010) ("A prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive.").

[6, 7] Once the employee asserts a prima facie case, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii). The "clear and convincing evidence" standard is the intermediate burden of proof, in between "a preponderance of the evidence" and "proof beyond a reasonable doubt." *See Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). To meet the burden, the employer must show that "the truth of its factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (internal quotation omitted).

It is worth emphasizing that the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard. As the Eleventh Circuit noted in a case under the Energy Reorganization Act, 42 U.S.C. § 5851, a statute that uses a similar burden-shifting framework, "[f]or employers, this is a tough standard, and not by accident." *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir.1997). The Eleventh Circuit stated that the standard is "tough" because Congress intended for companies in the nuclear industry to "face a difficult time defending themselves," due to a history of whistleblower harassment and retaliation in the industry. *Id.* The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment. We note, for example, that the House Committee on Transportation and Infrastructure held a hearing to "examine allegations ... suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting on-the-job injuries." (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007)). As the Majority Staff of the Committee on Transportation and Infrastructure noted to members of the Committee:

> The accuracy of rail safety databases has been heavily criticized in a number of government reports over the years. The primary issue identified in many previous government investigations is that the rail industry has a long history of underreporting incidents and accidents in compliance with Federal regulations. The underreporting of railroad employee injuries has long been a particular problem, and railroad labor organizations have frequently complained that harassment of employees who reported injuries is a common railroad management practice.

*Id.*[6] The report noted that one of the reasons that pressure is put on railroad employees not to report injuries is the compensation system; some railroads base supervisor compensation, in part, on the number of employees under their supervision that report injuries to the Federal Railroad Administration. *Id.* We will leave our discussion of the legislative his-

---

6. *See also id.* (Introductory Remarks of Rep. Oberstar) ("Reports have documented a long history of under-reporting of accidents, under-reporting incidents, of noncompliance with Federal regulations; and under-report-ing of rail injuries is significant because employees frequently report that harassment of those who do report incidents, being hurt on the job, is a common practice in the rail sector.".)